Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2021
No. 20-4248

COMMODITIES & MINERALS ENTERPRISE LTD.,
*Petitioner-Appellee,*

*v.*

CVG FERROMINERA ORINOCO, C.A.,
*Respondent-Appellant.*

Appeal from the United States District Court
for the Southern District of New York

ARGUED: FEBRUARY 1, 2022
DECIDED: OCTOBER 3, 2022

Before: CABRANES, LYNCH, and NARDINI, *Circuit Judges.*

Respondent-Appellant CVG Ferrominera Orinoco, C.A. ("Ferrominera"), appeals from the judgment of the United States District Court for the Southern District of New York (Andrew L. Carter, Jr., *Judge*) confirming a foreign arbitral award and granting

attorney's fees and costs in favor of Petitioner-Appellee Commodities & Minerals Enterprise Ltd. ("CME"). Ferrominera challenges the judgment on three grounds. First, it argues that the district court lacked personal jurisdiction because CME never served a summons on Ferrominera in connection with its motion to confirm the arbitral award. Second, Ferrominera contends that the district court erred in confirming the arbitral award based on purported lack of jurisdiction by the arbitral panel, issues with the scope of the award, and conflicts with United States public policy. Third, it argues that the district court abused its discretion in awarding attorney's fees and costs in favor of CME.

As to the first point, we hold that a party is not required to serve a summons in order to confirm a foreign arbitral award under the New York Convention. We further conclude that the district court properly enforced the arbitral award, but that it erred in awarding attorney's fees and costs. Accordingly, we **AFFIRM** in part and **VACATE** in part.

---

BRUCE G. PAULSEN (Brian P. Maloney, *on the brief*), Seward & Kissel LLP, New York, NY, *for Petitioner-Appellee*.

GARTH S. WOLFSON, Mahoney & Keane, LLP, New York, NY, *for Respondent-Appellant*.

---

WILLIAM J. NARDINI, *Circuit Judge*:

Respondent-Appellant CVG Ferrominera Orinoco, C.A. ("Ferrominera"), appeals from the judgment of the United States

2

District Court for the Southern District of New York (Andrew L. Carter, Jr., *Judge*) confirming a foreign arbitral award and granting attorney's fees and costs in favor of Petitioner-Appellee Commodities & Minerals Enterprise Ltd. ("CME"). Ferrominera challenges the judgment on three grounds. First, it argues that the district court lacked personal jurisdiction over Ferrominera because CME did not serve a summons when it moved to confirm the arbitral award. Second, Ferrominera contends that the district court erred in confirming the award, pointing to purported defects in the arbitral panel's jurisdiction, issues with the scope of the panel's award, and conflicts with United States public policy. Third, it argues that the district court abused its discretion in awarding attorney's fees and costs in favor of CME.

We hold that a party is not required to serve a summons in order to confirm a foreign arbitral award under the New York Convention, more formally known as the Convention on the

3

Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 38 (as applied through the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-208). We further hold that the district court properly enforced the arbitral award, but that it erred in awarding attorney's fees and costs. Accordingly, we **AFFIRM** in part and **VACATE** in part.

## I. Background

### A. The commercial relationship

CME is incorporated under the laws of the British Virgin Islands and is in the business of trading commodities and minerals, including iron ore. Ferrominera is a Venezuelan company, owned by the Venezuelan government, that produces and exports iron ore.

The dispute in this case stems from a contract involving a ship named the *General Piar*. In 2010, Ferrominera chartered the *General Piar* from CME to shuttle iron ore from Ferrominera's Venezuelan mines, down the Orinoco River, and to an offshore transfer station

4

where it would be shipped away by CME.[1]  The seventeen-page

charter between CME and Ferrominera (the "General Piar Charter")

contains a broad arbitration clause, which states, in part:

> This charter shall be governed by and construed in accordance with Title 9 of the United States Code and the maritime law of the United States Code and any dispute arising out of or in connection with this contract shall be referred to three persons at New York . . . ; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction.  The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

Joint App'x at 215-16.

## B.    The arbitration proceeding

By February 2016, the parties' commercial relationship had

deteriorated.  Seeking to recover for unpaid invoices, lost profits, and

attorney's fees, CME commenced an arbitration proceeding before a

---

[1] More precisely, in 2010 CME entered a five-year time-charter for the *General Piar* from the ship's owner, and then sub-chartered the ship to Ferrominera.  The then-President and Chairman of the Board of Directors of Ferrominera signed the charter, and the Board of Directors formally approved it.

5

panel of three arbitrators (the "Panel") in New York City pursuant to the rules of the Society of Maritime Arbitrators (the "SMA Rules").

Ferrominera raised numerous jurisdictional defenses and substantive counterclaims. Among other things, it argued that the Panel lacked jurisdiction over the dispute because the General Piar Charter and its arbitration agreement were obtained through corruption and thus void, and that the arbitration agreement was invalid under Venezuelan law. Ferrominera also argued that CME's claims fell outside the scope of the arbitration clause. In the alternative, Ferrominera argued a variety of set-offs and counterclaims.

On December 20, 2018, the Panel found for CME and rejected Ferrominera's defenses.[2] The Panel concluded that it had jurisdiction over the dispute and that the arbitration agreement covered the

---

[2] The Panel issued the Final Award on December 20, 2018, which explained the Panel's reasoning in over 150 pages. On February 11, 2019, the Panel issued a Corrected Award, which corrected clerical errors in the Final Award (together, "the Award").

6

claims and counterclaims. As to the contract defenses, the Panel found that the General Piar Charter was not void or unenforceable, and was not invalid under Venezuelan law. Specifically, the Panel concluded that the evidence Ferrominera presented did not show that CME had engaged in corruption with respect to the General Piar Charter. As to the arguments of invalidity under Venezuelan law, the Panel held that Venezuelan law did not apply because U.S. maritime law was selected in the choice-of-law provision of the General Piar Charter. Even if Venezuelan law did apply, the Panel agreed with an expert in Venezuelan law offered by CME and determined that the Charter and its arbitration agreement would nonetheless be enforceable under the Venezuelan doctrine of "good faith." The Panel found for CME and issued an award for $12,655,594.36, plus post-award interest at an annual rate of 5.5% until the award is fully paid or confirmed and made a judgment of the court.

## C. Court proceedings to confirm the arbitral award

On December 19, 2019, CME brought this action to confirm the arbitral award in the Southern District of New York. CME sought entry of a judgment against Ferrominera, including the Panel's Award of $12,655,594.36 plus interest, as well as costs and expenses in favor of CME, including reasonable attorney's fees.

Ferrominera argued that the award should not be confirmed. It argued, *inter alia*, that the service of notice was defective; that the Panel lacked jurisdiction to arbitrate the dispute; that the Panel's award exceeded the scope of the arbitration agreement by failing to credit Ferrominera for payments it had made to CME under the General Piar Charter, and instead allocating them to different contracts; and that enforcing the award would violate United States public policy because the General Piar Charter was obtained through corruption.

On December 10, 2020, the district court entered judgment in favor of CME, granting CME's application to confirm the award and

8

its request for attorney's fees and costs.  Ferrominera appeals this judgment.

## II.    Discussion

On appeal, Ferrominera first challenges the district court's exercise of personal jurisdiction based on an alleged defect in service of notice, namely CME's failure to serve a summons.  It next contests the district court's confirmation of the award, arguing (1) that the Panel lacked jurisdiction over the dispute because the parties' arbitration agreement was invalid under Venezuelan law; (2) that the Award exceeded the scope of the arbitration provision because it improperly allocated payments made by Ferrominera to CME to other contracts; and (3) that enforcement of the Award would violate United States public policy because the General Piar Charter had been obtained through corruption.  Finally, it challenges the award of attorney's fees in favor of CME.

For the reasons discussed below, we affirm the district court's ruling confirming the Award, but hold that it abused its discretion in awarding attorney's fees and costs to CME.

## A.  Governing legal standards

An application to confirm a foreign arbitral award [3] "'is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'" *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.3d 171, 176 (2d Cir. 1984)). "The review of arbitration awards is 'very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23 (quoting *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993)). That review is

---

[3] The New York Convention, also called the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, defines its application, in relevant part, as to "awards not considered domestic." Art. 1. As the Convention's title suggests, such non-domestic awards are also referred to as foreign awards, and we will use the latter term here.

"extremely deferential" to the findings of the arbitration panel. *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007).

The parties do not dispute that this case falls under the New York Convention. *See Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983) (holding that the New York Convention's application to arbitral awards "not considered as domestic" includes awards "involving parties domiciled or having their principal place of business outside the enforcing jurisdiction"); *see also* 9 U.S.C. §§ 201-208 (incorporating the New York Convention). Article V of the New York Convention governs a district court's review of an application to confirm a foreign arbitral award. That Article contains an exhaustive list of seven defenses to confirmation,[4] and states that the

---

[4] In full, Article V of the New York Convention states:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

"party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses" applies. *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005) (citing the New York Convention, Art. V(1)); *see also* 9 U.S.C.

> (a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>
> (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>
> (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or
>
> (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or
>
> (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.
>
> 2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:
>
> (a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or
>
> (b) The recognition or enforcement of the award would be contrary to the public policy of that country.

§ 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."). "The burden is a heavy one, as 'the showing required to avoid summary confirmance is high.'" *Encyclopaedia Universalis*, 403 F.3d at 90 (quoting *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23). "In sum, a district court *must* enforce an arbitral award unless a litigant satisfies one of the seven enumerated defenses [under the New York Convention]; if one of the defenses is established, the district court *may* choose to refuse recognition of the award." *Corporación Mexicana de Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploración y Producción* ("*Pemex*"), 832 F.3d 92, 106 (2d Cir. 2016).

On appeal of a district court's confirmation of an arbitral award, "[w]e review a district court's legal interpretations of the New York Convention as well as its contract interpretation de novo; findings of fact are reviewed for clear error." *Leeward Constr. Co., Ltd.*

13

*v. Am. Univ. of Antigua-Coll. of Med.*, 826 F.3d 634, 638 (2d Cir. 2016) (quoting *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013)); *see also Pemex*, 832 F.3d at 100.

## B. Personal jurisdiction

Ferrominera first challenges the district court's exercise of personal jurisdiction in this proceeding, antecedent to the question of whether any of the seven defenses to confirmation under the New York Convention apply. Ferrominera argues that because it is an instrumentality of a foreign state, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608, requires the delivery of a summons upon it to properly effect service. Because CME never served a summons, Ferrominera claims, service was fatally deficient and the

14

district court erred in exercising personal jurisdiction over Ferrominera.[5]

For the reasons that follow, we are not persuaded by Ferrominera's argument. The FAA explicitly requires only service of notice of the application to confirm the arbitral award, not also a summons. Although the FAA partially incorporates the FSIA (through the Federal Rules of Civil Procedure) to fill gaps in *how* service must be made on a foreign instrumentality, those cross-references do not alter *what* must be served under the FAA.

---

[5] CME mailed the petition to confirm the Award and its supporting documents to the last known addresses of Ferrominera's counsel in the United States, France, and England and to Ferrominera's last known address in Venezuela. It also delivered the petition by hand courier to Ferrominera's Venezuelan address.

CME argues that Ferrominera has waived its service of process objection by failing to raise that argument sufficiently before the district court. We disagree. Ferrominera raised its objection in its initial appearance before the district court and, in its brief opposing CME's petition to confirm the Award, cross-referenced that argument in a footnote. That was enough to put the district court on notice as to Ferrominera's jurisdictional defenses and to preserve the issue for appeal. *See Transaero, Inc v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 729 (2d Cir. 1998).

Accordingly, the district court correctly rejected Ferrominera's service argument and appropriately exercised personal jurisdiction.

To understand how service must be made on an instrumentality of a foreign government in a proceeding to confirm a foreign arbitral award, we must consider a series of cross-references involving the FAA, the Federal Rules of Civil Procedure, and the FSIA.

Our starting point is Chapter 2 of the FAA, which codifies enforcement of foreign arbitral awards under the New York Convention. Chapter 2 instructs parties on how to file an application to confirm such an award, and how to defend against confirmation, but it does not lay out any rules for service of process. Section 207 authorizes a party to "apply" to a competent court "for an order confirming [an] award." 9 U.S.C. § 207. Such an application must be confirmed unless the court finds "one of the grounds for refusal or deferral of recognition or enforcement of the award specified" in the

16

New York Convention. *Id.* But aside from requiring the party to file its application to confirm, neither Chapter 2 nor the New York Convention specifies how an adverse litigant must be notified of the new proceeding.

To fill that gap, Chapter 2 resorts (with some caveats) to the rules governing domestic arbitral awards set forth in Chapter 1 of the FAA. Specifically, § 208 incorporates the provisions of Chapter 1, though only "to the extent that [Chapter 1] is not in conflict with [Chapter 2] or the Convention as ratified by the United States." 9 U.S.C. § 208. One of these incorporated provisions is § 9 of the FAA, which sets forth the procedure for confirming domestic awards, including service-of-process rules. Section 9 tells us that "[i]f the adverse party shall be a nonresident [of the district within which the award was made], then the *notice of the application* shall be served by the marshal of any district within which the adverse party may be found *in like manner as other process of the court*." 9 U.S.C. § 9 (emphasis

17

added).  As the italicized language indicates, § 9 specifies both *what* is

to be served ("notice of the application") and *how* it is to be served

("in like manner as other process of the court").  But that latter

phrase—"in like manner as other process of the court"—requires us

to look elsewhere to understand how "other process" is carried out.[6]

_____

[6] Although Ferrominera contends that service of a summons was required (in light of further cross-references to the FSIA that we shall discuss shortly), it does not argue that such overseas service had to be accomplished by the U.S. Marshals Service under § 9 of the FAA.  Nor would such a contention make any sense.  Although § 9 indicates that notice shall be served "by the marshal of any district within which the adverse party may be found," that provision is incorporated into Chapter 2 (governing foreign arbitral awards) only "to the extent" that it does not "conflict" with Chapter 2 or the New York Convention.  In a foreign arbitral proceeding where the adverse party is overseas, there is often no "district within which the adverse party may be found," and hence no such marshal to be employed.  And in any event, service by the U.S. Marshal—a domestic law enforcement official—would often be impossible on a foreign instrumentality overseas.  This is why private process servers are now the norm, even in the context of foreign sovereigns. *See* Foreign Process, U.S. Marshals, https://www.usmarshals.gov/what-we-do/service-of-process/civil-process/foreign-process (last visited on Sept. 2, 2022).  Because it would seemingly conflict with the New York Convention to require parties to use a mode of service that cannot be executed, it is hard to imagine how § 9's reference to marshals would be incorporated by reference into Chapter 2's codification of the New York Convention with respect to foreign parties. *See, e.g., In re Arbitration Between InterCarbon Bermuda, Ltd. and Caltex Trading & Transp. Corp.*, 146 F.R.D. 64, 67 n.3 (S.D.N.Y. 1993) ("Section 12 [governing motions to vacate arbitral awards] is an anachronism not only because it cannot account for the internationalization of arbitration law subsequent to its enactment, but also because it cannot account for the subsequent abandonment of United States marshals as routine process

Thus, we turn to the Federal Rules of Civil Procedure, which establish the general mode of serving process in federal courts. It is well established that—with one important qualification—Rule 4 sets forth the basic procedures for serving process in connection with arbitral awards. *Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1277 (2d Cir. 1971) ("The phrase 'in like manner as other process of the court' found in § 9 of the Arbitration Act refers to Fed. R. Civ. P. 4 on the accomplishment of appropriate service[.]"). That qualification, however, is set forth in Rule 81, which provides that the Federal Rules of Civil Procedure, "to the extent applicable, govern proceedings under the [FAA], except as [that] law[] provide[s] other procedures." Fed. R. Civ. P. 81(a)(6)(B). And so our next question is how Rule 4, only to the extent consistent with the FAA, directs service of process in the circumstances before us.

---

servers."). But Ferrominera does not press the point, and so we need not resolve the issue here.

19

Here, where the adverse party is the instrumentality of a foreign state, Rule 4 cross-references special rules of the FSIA. Specifically, Rule 4 provides that "[a] foreign state or its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). Section 1608(b), in turn, provides a series of cascading alternatives to serve such a foreign instrumentality:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

20

(A)   as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B)   by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C)   as directed by order of the court consistent with the law of the place where service is to be made.

28 U.S.C. § 1608(b)(1)-(3).  It is here, in each of the three options listed in § 1608(b)(1), (2), and (3), that Ferrominera points to the requirement that service be accomplished by "delivery of a copy of the summons and complaint."

Given that wandering path, we pause to briefly restate the journey.  Neither Chapter 2 of the FAA nor the New York Convention mention service requirements for an application to confirm an arbitral award.  Chapter 2 of the FAA incorporates Chapter 1 as a gap-filler, insofar as the two do not conflict.  Chapter 1 of the FAA requires service of a "notice of application," which must be done "in like manner" as other court process.  The phrase "in like manner" refers

to Federal Rule of Civil Procedure 4 (which, Rule 81 reminds us, must always be consistent with the FAA). For foreign instrumentalities, Rule 4(j) directs us to § 1608 of the FSIA, which describes various methods of service on foreign instrumentalities or agencies. And it is only at this last stop—§ 1608(b)—that we find the first mention of a "summons and complaint."

Ferrominera argues that because CME failed to serve it with a summons, it failed to comply with the service requirements of the FSIA. It contends that the FSIA dictates "the exclusive means by which service of process may be effected," and that § 1608(b) of the FSIA requires service of "a summons" even in proceedings to confirm an arbitral award. Appellant Br. at 12 (quoting *Seramur v. Saudi Arabian Airlines*, 934 F. Supp. 48, 51 (E.D.N.Y. 1996)). We are not persuaded.

We hold that a summons is not required to properly effect service when seeking confirmation of a foreign arbitral award against

22

a foreign instrumentality. We reach this conclusion for two principal reasons: (1) the FAA itself defines the *documents* to be served, and cross-references other provisions (including Rule 4 and the FSIA) only to fill gaps in the permissible *manner* of serving those documents; and (2) it would make no sense to import the FSIA's requirement of service of a "summons and complaint" into the FAA because motions to confirm arbitral awards are not commenced by the filing of a complaint.

First, a plain reading of the relevant statutes and rules supports the conclusion that the only thing that must be served is the notice of application. Chapter 1, § 9 of the FAA specifies that "the *notice of the application* shall be served . . . in like manner as other process of the court." 9 U.S.C. § 9 (emphasis added). The FAA does not require service beyond this. Although the FSIA mentions delivery of something different from a notice of application—a "summons and complaint," 28 U.S.C. § 1608(b)(1)-(3)—recall that procedures

23

otherwise provided for are not incorporated upstream into the FAA. Rule 81(a)(6)(B) of the Federal Rules of Civil Procedure enables only limited incorporation of the FSIA into Rule 4—that is, "except as [the FAA] provide[s] other procedures." Here, § 9 of the FAA provides a procedure on what notice shall be served upon the opposing party— "notice of the *application"*—thereby triggering the exception to incorporation. 9 U.S.C. § 9 (emphasis added). Because the reference in § 1608(b)(1)-(3) to "the delivery of a copy of the summons and complaint" remains unincorporated, it bears no weight. Moreover, § 9 of the FAA cross-references other provisions only to determine the "manner" in which notice of the application must be served. The FSIA is therefore incorporated into the FAA only to the extent it answers *how* to serve process, not to supplant the FAA's specification of *what* must be served.

Second, a proceeding to confirm an arbitral award under the FAA is commenced by an application rather than a "complaint";

accordingly, there is no basis for serving a "summons and complaint,"

which are the documents referenced in § 1608(b). We have explained

that "'confirmation of an arbitration award is a summary proceeding

that merely makes what is already a final arbitration award a

judgment of the court.'" *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23

(quoting *Florasynth, Inc.*, 750 F.2d at 176). Lest there be any doubt, the

FAA's provision implementing the New York Convention calls for a

party merely to "apply to" the court for an "order confirming the

award[.]" 9 U.S.C. § 207; *see* 9 U.S.C. § 9 ("notice of the *application* [to

confirm an arbitral award] shall be served" on the adverse party "in

like manner as other process of the court") (emphasis added); *accord*

*Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Industrial*

*y Comercial*, 745 F. Supp. 172, 182 (S.D.N.Y. 1990) ("A confirmation

proceeding under the Convention is not an original action, it is, rather

in the nature of a post-judgment enforcement proceeding." (internal

quotation marks and alterations omitted)). Given the summary

nature of confirmation proceedings, it is unsurprising that the FAA would require only service of notice of an application as opposed to service of a full summons and complaint. *See Teamsters Local 177 v. United Parcel Serv.*, 966 F.3d 245, 252, 254 (3d Cir. 2020) (agreeing with *Florasynth*, 750 F.2d at 176, that confirmation of an arbitration award is a summary proceeding, and noting that summary proceedings may be "conducted without formal pleadings, on short notice, without summons and complaints, generally on affidavits, and sometimes even *ex parte*" (quoting *New Hampshire Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 406 (1960))). And because no "complaint" is involved in a motion to confirm an arbitral award, it would make little sense to read the FAA as incorporating the FSIA's instruction to serve both "a summons and complaint" (and even less sense to conclude that only half of that pair of documents—namely, a summons—must be served). Thus, we hold that the New York Convention and the FAA

26

require only service of notice of the application to confirm a foreign

arbitral award, and not also a summons.[7]

Having reached this legal conclusion, we easily determine that

CME properly effected service of notice on Ferrominera. Under the

first of the three modes of service listed in § 1608(b) of the FSIA,

[7] This conclusion is consistent with at least three district courts in this Circuit to have faced similar questions. *See Associated Indus. Ins. Co. v. Excalibur Reinsurance Corp.*, No. 13 CIV. 8239, 2014 WL 6792021, at *4 (S.D.N.Y. Nov. 26, 2014) (service of summons not required to commence proceeding to vacate domestic arbitration award under the FAA); *Scandinavian Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 732 F. Supp. 2d 293, 305-06 (S.D.N.Y. 2010) (service of summons not required to commence proceeding to confirm foreign arbitral award under the New York Convention and FAA), *rev'd on other grounds*, 668 F.3d 60 (2d Cir. 2012); *Home Ins. Co. v. RHA/Pennsylvania Nursing Homes, Inc.*, 113 F. Supp. 2d 633, 635 n.10 (S.D.N.Y. 2000) (service of summons not required for purpose of commencing proceeding to confirm domestic arbitration award under the FAA).

Ferrominera points to two district court actions in Florida between these same parties where, in both cases, the courts held that it was improper for CME to fail to serve a summons in filing its application for enforcement of other, related arbitral awards. *See Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.*, No. 17-20196-CIV, 2017 WL 11625759, at *3 (S.D. Fla. Apr. 4, 2017); *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 338 F.R.D. 664, 667 (S.D. Fla. 2021); *see also Ballantine v. Dominican Republic,* 19 Civ. 3598, 2020 WL 4597159, at *2-4 (D.D.C. Aug. 11, 2020) (holding that petitioners failed to effect valid service on the Dominican Republic of a motion to vacate an arbitral award for various reasons, including failure to serve a timely summons under the FSIA). Those courts relied on the phrase "summons and complaint" in § 1608(b) of the FSIA to conclude that service of a summons was required. In our view, these courts erred in failing to start their analysis with the FAA, which incorporates the FSIA's requirements only as to the *manner* of service, not *what* must be served.

service "shall be made . . . in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality." 28 U.S.C. § 1608(b)(1). Here, neither party disputes that the General Piar Charter incorporated the SMA Rules and that those rules constitute a "special arrangement" for the purposes of § 1608.[8] SMA Rule 35 provides that

> Wherever parties have agreed to arbitration under these Rules, they shall be deemed to have consented to service of any papers, notices or process necessary to initiate or continue an arbitration under these Rules or a court action to confirm judgment on the Award issued. Such documents may be served:
>
> a. By mail addressed to such party or counsel at their last known address; or
>
> b. By personal service.

---

[8] Ferrominera separately contests whether the arbitration agreement (which incorporates the SMA rules) is valid. This argument is addressed later in this opinion. *See infra* at Section II.C. But that argument aside, Ferrominera does not contest that if the arbitration agreement is valid, it incorporates the SMA Rules, nor that the SMA Rules are an incorporated "special arrangement" under § 1608 of the FSIA.

Joint App'x at 237. The district court found, and the parties do not dispute, that CME complied with this special arrangement. *Commodities & Minerals Enter., Ltd. v. CVG Ferrominera Orinoco, C.A.*, No. 19-cv-11654-ALC, 2020 WL 7261111, at \*2, \*4 (S.D.N.Y. Dec. 10, 2020) ("CME served the instant petition and supporting documents on arbitration counsel to [Ferrominera] . . . and on [Ferrominera] at its last known address, in Venezuela by mail."). As a result, CME complied with the service of notice requirements of the New York Convention and the FAA, and the district court properly exercised personal jurisdiction over Ferrominera.

## C.    Confirmation of the Award

Ferrominera next raises three arguments challenging the district court's confirmation of the award: (1) the arbitration agreement was invalid under Venezuelan law, and therefore the panel lacked jurisdiction to hear the dispute; (2) in the alternative, if the arbitration agreement was valid, the Panel nonetheless exceeded the scope of its jurisdiction under the arbitration agreement in its

29

calculation of damages; and (3) confirming the Award would violate United States public policy because the General Piar Charter was the product of corruption.

We reject all three arguments.

### 1. Validity of the arbitration agreement

Ferrominera first challenges the confirmation of the Award on the ground that the Panel lacked jurisdiction because the arbitration agreement was invalid under Venezuelan law.

With respect to this challenge, Ferrominera fails to identify what (if any) specific defense it invokes under Article V(1) of the New York Convention. This is a serious lapse. Because the defenses listed under Article V are exhaustive and Ferrominera carries a heavy burden to prove such a defense, *see Encyclopaedia Universalis*, 403 F.3d at 90, a party must first identify which defense it is invoking to establish any potential entitlement to that defense. When faced with this same briefing deficiency at the district court, Judge Carter construed this argument as falling within Article V(1)(a) and

characterized Ferrominera's challenge as against the "validity" of the agreement. *See Commodities & Minerals Enter.*, 2020 WL 7261111, at *4 n.3. On appeal, Ferrominera has not challenged Judge Carter's characterization, and so we limit ourselves to that enumerated defense.[9]

Ferrominera argues that the arbitration agreement was not "valid" because it was not authorized under any of three different Venezuelan laws. Specifically, it argues that various approvals were not in place from different Venezuelan officials, which were necessary for this state-owned business to enter an arbitration agreement. This argument is premised on the notion that the existence of a valid arbitration agreement is governed by Venezuelan law.

---

[9] We note that Article V(1)(a) also provides for another defense, distinct from the invalidity of the arbitration agreement, that "[t]he parties to the [arbitration] agreement . . . were, under the law applicable to them, under some incapacity . . . ." Ferrominera has not cited this provision in its briefing before this Court, nor did it do so before the district court. Accordingly, we limit ourselves to the question of whether the arbitration agreement was "valid" within the meaning of Article V(1)(a).

But Article V(1)(a) says otherwise. Whether an arbitration agreement is "valid" is governed by "the law to which the parties have subjected it" (or "failing any indication thereon, under the law of the country where the award was made"). New York Convention, Art. V(1)(a). Consistent with this language, we have repeatedly held that the existence or validity of an arbitration agreement is governed by a choice-of-law clause where one exists, because choice-of-law clauses are separable when the contract's validity is otherwise disputed. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50-51 (2d Cir. 2004) (applying choice-of-law clause selecting Swiss law to determine validity of international arbitration agreement); *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32 n.3 (2d Cir. 2001) (applying New Jersey and New York choice-of-law clauses to a party's claim that the underlying arbitration agreements were void because they were signed by an unauthorized agent); *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996) (applying an English choice-of-

law clause to an issue of contract formation); *see also* 3 Gary Born, *International Commercial Arbitration* § 26.05(C) (3d ed. 2021) ("A choice of law agreement is effective to select the law governing the arbitration agreement even if one party denies the validity or existence of those agreements.").

Ferrominera contends that applying the Charter's choice-of-law clause to questions of validity inappropriately presumes the conclusion—namely, that the dispute resolution provision in which that choice-of-law clause sits is valid. Ferrominera relies on *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012), to support this argument, but *Schnabel* is readily distinguished from the present case. In *Schnabel*, the Court declined to enforce the choice-of-law clause when considering whether the underlying contract was valid because there was a dispute about whether the choice-of-law clause had been part of the contract at the time of its formation. *Id.* at 114-19. Because the choice-of-law clause was specifically challenged, "[a]pplying [it]

to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." *Id.* at 119. Thus, rather than a broad exception to the ordinary rule (that choice-of-law clauses are separable), *Schnabel* presents only a narrow corollary to the logic of separability: if the validity of the choice-of-law clause is *specifically* challenged, that clause cannot be evaluated separately from the contract.[10]

Here, unlike in *Schnabel*, there is no dispute that the choice-of-law clause is included in the General Piar Charter, which both parties signed. Therefore, the ordinary rule—that choice-of-law clauses are separated out from contracts for questions of validity—applies in full force. *See Motorola*, 388 F.3d at 50-51. Applying that rule, we find that the General Piar Charter contained a choice-of-law clause, and that

---

[10] A similar rule exists in the context of arbitration clauses. Although arbitration agreements are ordinarily separable from questions of broader contract validity, *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402 (1967), they cannot be separated when the arbitration agreement is itself challenged as invalid. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446-49 (2006).

clause opted for U.S. maritime law. Joint App'x at 215-16. Accordingly, U.S. law, and not Venezuelan law, governs the General Piar Charter, including any question about the arbitration agreement's validity.[11]

Ferrominera's arguments as to why there is no valid arbitration agreement, however, are limited exclusively to Venezuelan law. It has made no such arguments under U.S. maritime law. Because a party resisting confirmation of a foreign arbitral award has the burden of establishing a defense under Article V(1), we conclude that Ferrominera has not borne its burden to show that the arbitration

---

[11] Although the district court correctly determined that U.S. law applied, it reached that conclusion by finding that the arbitration clause encompassed issues of arbitrability, and therefore deferred to the Panel's findings, even on the choice of law issue. *Commodities & Minerals Enter.*, 2020 WL 7261111, at *5. As outlined here, however, on a motion to confirm a foreign arbitral award the law governing the validity of the arbitration agreement is dictated not by deference to the Panel's decision, but rather by Article V(1)(a) of the New York Convention, which directs the court to review issues of arbitration agreement validity under "the law to which the parties have subjected it or, failing any indication thereof, under the law of the country where the award was made." The district court's deference to the Panel on this point was therefore unwarranted, but we agree with the conclusions of both the Panel and the district court that U.S. maritime law applies.

agreement is invalid where, as here, it has put forth no arguments whatsoever under the applicable law.[12] Accordingly, the arbitration agreement is valid and enforceable.

## 2. The scope of the arbitration agreement

Ferrominera next argues that the Award should not be confirmed under Article V(1)(c) of the New York Convention because the Panel exceeded its authority in calculating damages. Specifically, Ferrominera contends that the Panel incorrectly allocated past payments it made to CME to contracts other than the General Piar

---

[12] Ferrominera also argues that the Panel's decision on the validity of the arbitration agreement should have been reviewed *de novo* by the district court. But we need not reach this issue. Regardless of how much (if any) deference might have been warranted, the fact remains that Ferrominera presented no arguments under U.S. maritime law to justify disturbing the Panel's conclusion that it had jurisdiction to arbitrate the dispute.

Furthermore, while it is true that there is caselaw suggesting that a court can review challenges to the validity of an arbitration agreement when those challenges are either to the arbitration agreement itself (rather than the contract as a whole) or to the whole contract as void *ab initio*, *see, e.g.*, *Buckeye Check Cashing*, 546 U.S. at 444 n.1, 446-48; *Sphere Drake Ins. Ltd.*, 263 F.3d at 32, those cases all arose at the threshold stage of arbitration, on motions to compel. Whether those cases also stand for the proposition that a court may (or must) review the validity of an arbitration agreement *de novo* on a motion to confirm (or, for that matter, on a motion to vacate), does not necessarily follow. For the reasons stated above, however, we need not address this question.

Charter. In so doing, its argument goes, the Panel violated Ferrominera's right to decide how to allocate payments among these contracts and improperly shifted moneys already paid to the disputed General Piar Charter.

But Ferrominera's claim amounts to nothing more than a quarrel over how much it owes in damages, which was properly a question for the arbitrators. As the district court correctly held, Article V(1)(c) provides a defense to confirmation where an arbitration award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." The question of the correct calculation of damages "falls squarely within the broad arbitration clause in the General Piar Charter." *Commodities & Minerals Enter.*, 2020 WL 7261111, at *5. Ferrominera's argument—which is, at most, that the Panel calculated damages incorrectly—thus falls outside of Article V(1)(c) and, in fact,

outside of any defense listed in Article V. *Cf. Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) ("It is not enough for petitioners to show that the panel committed an error—or even a serious error. It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." (cleaned up)); *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 976-77 (2d Cir. 1974) (rejecting appellant's attack on money awarded for start-up expenses and costs because the New York Convention "does not sanction second-guessing the arbitrator's construction of the parties' agreement").

### 3. United States public policy

Ferrominera brings its final argument against confirmation of the Award under Article V(2)(b) of the New York Convention. The thrust of this argument is that the General Piar Charter was procured

through corruption and, therefore, enforcement of the Award would violate United States public policy.

This argument, however, falls outside the narrow public policy exception codified by Article V(2)(b). Article V(2)(b) allows a court to refuse "recognition or enforcement of the award [if such recognition or enforcement] would be contrary to the public policy of that country." *See Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405, 411 (2d Cir. 2009) (holding that confirming a foreign arbitral award was not contrary to New York's public policy against compelling a party to violate a foreign judgment). But "Article V(2)(b) must be 'construed very narrowly' to encompass only those circumstances 'where enforcement would violate our most basic notions of morality and justice.'" *Id.* at 411 (quoting *Europcar Italia S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998)). In reviewing an arbitral award for violations of public policy, a court may not "revisit or question the fact-finding or the reasoning which

produced the award." *IBEW, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 716 (2d Cir. 1998). Instead, "a court's task in reviewing . . . possible violations of public policy is limited to determining whether the award itself, as contrasted with the reasoning that underlies the award, 'create[s] [an] explicit conflict with other laws and legal precedents' and thus clearly violates an identifiable public policy." *Id.* (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987)). When a party claims that an underlying contract is invalid for violating public policy, that claim is "to be determined exclusively by the arbitrators." *Europcar Italia*, 156 F.3d at 315.

Ferrominera's public policy argument attacks the General Piar Charter itself, not the Award or its enforcement. The Panel carefully considered Ferrominera's corruption allegations and gave Ferrominera ample opportunity to substantiate its claim. Despite extensive discovery and opportunity to present its case, the Panel concluded that the General Piar Charter was not, as a factual matter,

the product of corrupt acts by CME. Both before the district court and here, Ferrominera merely seeks to relitigate the Panel's factual determination on this point. It offers no argument that enforcement itself, "within the parameters of the arbitrator's interpretation of the facts," *IBEW, Local 97*, 143 F.3d at 726, violates public policy.[13]

In sum, Ferrominera's public policy argument asks this Court to relitigate the Panel's factual determinations underlying the validity of the Charter. But this argument falls outside of Article V(2)(b)'s narrow public policy exception, and the district court properly rejected it.

---

[13] *Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F. Supp. 3d 95 (D.D.C. 2018), relied on by Ferrominera, only highlights the insufficiency of its argument. In *Hardy*, the court found that enforcement of an arbitration award against India would violate public policy. *Id.* at 110-11. But the award at issue was one for specific performance that required India to turn over certain land in that country to the plaintiff. *Id.* In that case, *enforcement of the award itself* violated clear United States policy respecting a sovereign nation's right to control its own land. *Id.* Those facts stand in sharp contrast to Ferrominera's argument here, which is nothing more than a collateral attack on the General Piar Charter and a thinly veiled effort to relitigate factual determinations made by the Panel. Ferrominera makes no argument that enforcing the Award, standing alone, violates public policy.

## D.     Attorney's fees

Lastly, Ferrominera challenges the district court's award of attorney's fees in favor of CME.

The district court granted CME's request for attorney's fees "in light of Ferrominera's failure to comply with the award or come forward with a good faith reason for not complying." *Commodities & Minerals Enter.*, 2020 WL 7261111, at *7. Although our review of fee awards is "highly deferential," *Mautner v. Hirsch*, 32 F.3d 37, 39 (2d Cir. 1994), we conclude that the district court abused its discretion here.

Generally, "in a federal action, attorney's fees cannot be recovered by the successful party in the absence of statutory authority for the award." *Int'l Chem. Workers Union (AFL-CIO), Local No. 227 v. BASF Wyandotte Corp.*, 774 F.2d 43, 47 (2d Cir. 1985). Section 9 of the FAA does not provide such statutory authority, because it makes no mention of the recovery of attorney's fees. Still, a court retains "inherent equitable powers" to "award attorney's fees when the

42

opposing counsel acts 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* (quoting *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974)). "As applied to suits for the confirmation and enforcement of arbitration awards, the guiding principle has been [that] 'when a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may properly be awarded.'" *Int'l Chem. Workers Union*, 774 F.2d at 47 (quoting *Bell Production Engineers Ass'n v. Bell Helicopter Textron*, 688 F.2d 997, 999 (5th Cir. 1982)).

Here, although we ultimately disagree with Ferrominera's arguments, we conclude that those arguments were not presented "without justification," *id.*, and that Ferrominera did not act "in bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich Co.*, 417 U.S. at 129. In particular, we note that the first question addressed in this opinion—namely, whether service of a summons is required to apply to a court for an order confirming a foreign arbitration award—

43

is a question of first impression for this Court. Furthermore, we acknowledge that Ferrominera twice achieved some success on this exact argument in another federal district court. *See Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.*, No. 17-20196-CIV, 2017 WL 11625759 (S.D. Fla. Apr. 4, 2017); *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 338 F.R.D. 664, 667 (S.D. Fla. 2021). We therefore cannot say that its arguments were brought in bad faith. *See Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986) ("[W]e have declined to uphold [fee] awards under the bad-faith exception absent both 'clear evidence' that the challenged actions are 'entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes' and a 'high degree of specificity in the factual findings of [the] lower courts.'" (quoting *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir. 1986))).

Accordingly, we vacate the portion of the judgment that awarded attorney's fees and costs to CME.

## III. Conclusion

In sum, we hold as follows:

(1) A party applying to a court to confirm a foreign arbitral award under Chapter 2 of the Federal Arbitration Act and the New York Convention is not required to serve a summons on the adverse party to satisfy the FAA's service of notice requirement. CME properly effected service of notice on Ferrominera because its service of notice complied with the parties' "special arrangement" as permitted under 28 U.S.C. § 1608(b)(1).

(2) The district court properly enforced the arbitration award because Ferrominera failed to establish that the arbitration agreement was invalid under U.S. maritime law, the Panel did not exceed its authority under the arbitration agreement

in issuing the Award, and the Award is not contrary to U.S. public policy.

(3) The district court abused its discretion in awarding attorney's fees and costs in favor of CME.

We therefore **AFFIRM** the judgment of the district court to the extent that it recognized and enforced the Award in favor of CME and **VACATE** the judgment of the district court to the extent that it awarded attorney's fees and costs in favor of CME.